Earl L. BUTZ, Secretary of the United States Department of Agriculture, Plaintiff,

v.

LAWSON MILK CO., DIVISION CONSOLIDATED FOODS CORP., Defendant.

No. C 71-760.

United States District Court, N. D. Ohio, E. D.

Nov. 21, 1974.

Donald D. Weisberger, Asst. U. S. Atty., Cleveland, Ohio, Edward M. Silverstein, Dept. of Agriculture, Washington, D. C., Peter J. Brickfield, Dept. of Justice, Washington, D. C., for plaintiff.

Paul W. Walter, Walter, Haverfield, Buescher & Chockley, Cleveland, Ohio, for defendant.

## MEMORANDUM OPINION AND ORDER

LAMBROS, District Judge.

Earl L. Butz, Secretary of the United States Department of Agriculture, (the "Secretary"),[1] brought the above-captioned action in his official capacity against the Lawson Milk Company Division, Consolidated Foods Corporation ("Lawson's") for the alleged violation of the Agricultural Fair Practices Act of 1967 (the "Act"), 7 U.S.C. §§ 2301–2306. The complaint charges Lawson's with violation of the Act in two counts. In Count I, the Secretary alleges that Lawson's has interfered with the right of an individual producer of milk, John Weir, to join an association of producers in violation of 7 U.S.C. § 2303, by terminating its contract with Weir for the purchase of his milk solely because Weir signed a membership agreement with Dairymen's Cooperative Sales Association ("DCSA"). The Secretary alleges in Count II that Lawson's marketing contracts contained certain language which constitutes a *per se* violation of § 2303, because the effect of such language is to coerce or intimidate any producer or dairy farmer from the exercise of his right to join and belong to an association of producers. The Secretary seeks the issuance of permanent injunctive relief to restrain Lawson's from continuing to refuse to accept Weir's milk allegedly because of his membership in DCSA; to restrain Lawson's from refusing to accept the milk of any member of DCSA or any other marketing association solely for the reason that they are members of that marketing association; and to restrain Lawson's from including the fourth paragraph contained in Lawson's Marketing Agreement with Weir in any of its marketing agreements or from using similar language which would be calculated to force or coerce any producer to refrain from joining a marketing association.

In its Answer, Lawson's admits that according to 7 U.S.C. § 2301, Congress has declared it, in part, to be contrary to the public interest to interfere with the right of individual farmers to join together voluntarily in cooperative organizations as authorized by law. However, Lawson's states that all of its dealings with John Weir as well as its contracts with its producers are lawful and permitted pursuant to 7 U.S.C. §§ 2301–2306, and particularly 7 U.S.C. § 2304. Lawson's contends that it terminated its Marketing Agreement, not because Weir became a member of DCSA, but because under the DCSA Marketing Agreement, Weir surrendered full control over the sale of his milk to DCSA and in so doing made DCSA his exclusive agent. Under these circumstances, Lawson's contends that the termination of its Marketing Agreement with Weir was lawful under

1. Secretary Butz was substituted as the plaintiff for the original plaintiff, Clifford M. Hardin, by stipulation and order filed January 25, 1972.

§ 2304 which provides, in pertinent part, that "nothing in this chapter shall . . . require a handler to deal with an association of producers." Moreover, Lawson's asserted in its Answer by way of defense that the Agricultural Fair Practices Act of 1967, 7 U.S.C. §§ 2301–2306 should be declared to be unconstitutional on the grounds that the Act is so vague and ambiguous, impossible to interpret, and discriminatory as respects handlers of milk like Lawson's as to constitute a denial of due process of law and a denial of equal protection of the laws of the United States.

## BACKGROUND

On December 26, 1973, this Court issued a memorandum opinion and order which particularized previous oral rulings on certain motions pending before the Court. The order denied Lawson's motion to consolidate the instant action with Lawson Milk Company Division Consolidated Foods Corporation v. Milk, Inc., et al., an antitrust suit which was filed on January 26, 1973 in the United States District Court for the Northern District of Ohio, Eastern Division, which had been temporarily transferred to the United States District Court for the Western District of Missouri, Western Division, for purposes of consolidating and coordinating pre-trial proceedings with a matter filed therein. It had been Lawson's contention that the discovery which was to be gleaned in the antitrust suit was necessary herein to bear out one defense that the allegedly restrictive marketing agreements in question were economically compelled and, therefore, legal. In denying the motion to consolidate, the Court made a finding that evidence of past and present economic conditions existing in the dairy industry in Ohio, as well as evidence of the alleged continued growth of monopolistic practices by Milk, Inc., the successor in interest to DCSA, were not relevant to the instant action. Accordingly, the Court also ruled that certain evidentiary matters relating to the antitrust suit, which Lawson's sought to present at the trial

to the Court, were irrelevant and inadmissible.

This matter proceeded to trial on January 10, 1974. The parties submitted a Joint Stipulation of Facts, Lawson's presented certain evidence relating to its defense under § 2304 and made a proffer for the record of that evidence which this Court had previously ruled inadmissible. The evidentiary presentations were concluded on January 11, 1974, at which time Lawson's once again moved for the admission of the proffered testimony into evidence, which motion was overruled. A schedule for the filing of post-trial briefs was established, and the matter was submitted at that time for this Court's determination on the merits.

Since the completion of the evidentiary hearing, Lawson's has filed several motions. On January 15, 1974, Lawson's filed a set of Interrogatories to the plaintiff and a Request for Production of Documents. On January 18, 1974, Lawson's filed a Notice to Take Deposition. On February 12, 1974, the Government filed objections to the discovery notices, and on February 15, 1974, Lawson's moved for a Court order to compel the discovery and for the imposition of sanctions for the Government's failure to comply. Lawson's has also renewed its motion for acceptance of the proffered testimony into evidence.

Lawson's motion to compel discovery and for sanctions under Rule 37 of the Federal Rules of Civil Procedure is inappropriate at this time and is overruled. Lawson's renewed motion for the inclusion of the proffered testimony into evidence is again overruled for the reasons set forth in the memorandum opinion and order of December 26, 1973. The evidentiary presentations in this action having been concluded and the Court having considered the matters presented therein, the following are the Court's findings of fact and conclusions of law.

## FACTUAL BACKGROUND

In making its findings, the Court has relied upon the Joint Stipulation of Facts

submitted by the parties, the exhibits presented to the Court, and the additional testimony admitted at the final hearing in this matter.

On September 1, 1958, Lawson's entered into an agreement with John H. Weir, entitled the Lawson's Marketing Agreement, whereby Weir, a dairy farmer, agreed to sell to Lawson's and Lawson's agreed to purchase from Weir all of the milk produced on his farm except that consumed by Weir and his family. Relevant paragraphs in that Agreement provided:

FIRST: The Producer represents and says that he is the sole owner of the herd and that he is not now under any contract or agreement to sell or allow any person, group, firm, association or corporation to sell for him any of the milk which he produces.

SECOND: The Producer agrees to sell to the Company, and the Company agrees to purchase from the Producer, all of the milk produced on the Producer's farm, except that consumed by the Producer and his family, for a period of six (6) months from the date of this agreement, and this agreement shall continue in force and effect thereafter unless cancelled by either party in accordance with the provisions of paragraph 7 of this agreement.

FOURTH: Should the Producer, during the period covered by this agreement, enter into an agreement with any person, group, firm, association, or corporation for the sale of his milk, effective during the period covered by this contract, or should the Producer misrepresent the facts, statements and representations set forth in Paragraph One of this agreement, the Company shall be relieved thereafter from all further obligations to purchase the Producer's milk and the Company may, if it desires, give notice to the Producer that it desires forthwith to cancel this agreement, and the Company shall not be liable for any damages resulting from its refusal to thereafter accept or purchase the Producer's milk; provided that in the event that the Producer does file suit against the Company for or growing out of its refusal to thereafter continue to purchase the Producer's milk, that the Producer shall be liable for, and the Producer shall hold the Company harmless from any loss, expense, court costs, attorney's fees, or any judgment resulting from such suit.

SEVENTH: This agreement may be cancelled and terminated by either party after the first six (6) months have elapsed, by either party giving to the other a written notice of its desire to terminate thirty (30) days before such termination shall become effective.

On April 16, 1968, Congress enacted the Agricultural Fair Practices Act of 1967, 7 U.S.C. §§ 2301–2306. Under the Act, 7 U.S.C. § 2302(b), a dairy farmer such as Weir who was engaged in the production of raw milk was defined as a "producer" of milk, and Lawson's, as a concern engaged in the acquiring of agricultural products from producers for processing and/or sale, was defined as a "handler" under § 2302(a). In 7 U.S.C. § 2303, Congress set forth certain practices which would be deemed unlawful if engaged in by a handler in his dealings with producers:

It shall be unlawful for any handler knowingly to engage or permit any employee or agent to engage in the following practices:

(a) To coerce any producer in the exercise of his right to join and belong to or to refrain from joining or belonging to an association of producers, or to refuse to deal with any producer because of the exercise of his right to join and belong to such an association; or

(b) To discriminate against any producer with respect to price, quantity, quality, or other terms of purchase, acquisition, or other handling of agricultural products because of his membership in or contract with an association of producers; or

(c) To coerce or intimidate any producer to enter into, maintain, breach, cancel, or terminate a membership agreement or marketing contract with an association of producers or a contract with a handler; or

(d) To pay or loan money, give any thing of value, or offer any other inducement or reward to a producer for refusing to or ceasing to belong to an association of producers; or

(e) To make false reports about the finances, management, or activities of associations of producers or handlers; or

(f) To conspire, combine, agree, or arrange with any other person to do, or aid or abet the doing of, any act made unlawful by this chapter.

On or about June 16, 1969, when the Lawson's Marketing Agreement was still in full force and effect, and no notice of termination had been issued by either Weir or Lawson's, Weir entered into an agreement with DCSA, an "association of producers" as defined in § 2302(c) and an association within the meaning of § 2303. Relevant portions of that agreement, referred to herein as the DCSA Marketing Agreement, provided:

WHEREAS, the Producer hereinafter designated is the owner of 30 cows and has subscribed for 3 shares of the par value of $2.50 of the capital stock of the Association, and in addition for one-tenth of a share of said stock for each cow owned by him in excess of ten cows, the purchase price of which is hereby transmitted or authorized to be deducted from the proceeds of the sale of milk, and he hereby requests membership in the East Liverpool #501 Branch of the Association, to which the first party assigns him, and desires by the execution of this agreement to consign the milk and cream produced by him in conformity with its terms.

FIRST: That the Producer appoints the Association his sole and exclusive agent to sell all milk and cream produced on any farm in the control of or operated by said Producer except such milk and cream as said Producer may retain for home consumption (unless the Producer secures the written consent of the Association to dispose of said milk and cream in another manner) and said Producer agrees to deliver said milk and cream at such times and to such persons and places as may be designated by the Association. The Producer agrees to make delivery of said milk and cream by such haulers or carriers and facilities and at such rates as are approved or fixed by said Association. Said milk and cream when so delivered shall be pure and unadulterated and shall meet conditions specified by the Association and the requirements of the city or place where marketed.

SIXTH: This agreement shall supersede and terminate all other contracts, agreements, or arrangements heretofore made by a Producer with respect to the sale of his milk or cream so long as no conflict occurs with existing contracts with other parties and the Producer hereby agrees not to renew and agrees to terminate at the earliest possible date any other existing contracts which would conflict with the Association's authority as the sole and exclusive agent for the undersigned Producer in the sale or handling of such milk or cream. Neither party shall seek to avoid this agreement by any name change, assignment, secret arrangement or other device, nor shall any such action relieve responsibility for contractual obligations on the part of either party.

The DCSA Agreement was effective as of July 1, 1969.

After signing this DCSA Marketing Agreement, Weir sent a letter to Lawson's which was dated June 27, 1969 and which read as follows:

Gentlemen:

This is to advise you that I have entered into a marketing contract with the Dairymen's Cooperative Sales Association, which is a milk marketing

cooperative. After July 1, 1969, it will represent me in all matters pertaining to the sale of my milk to you. I have authorized a deduction from the proceeds of the milk sold to you to be paid over to the association. The association will notify you of the amount of said deductions. I trust that you will cooperate and make the deduction and pay it over as I have requested. It is not my intention to terminate my contract with you but to continue to sell and ship my milk to you.

/s/ John H. Weir

Weir did not forward a copy of his DCSA Agreement to Lawson's. However, representatives of Lawson's were familiar with the typical DCSA Marketing Agreement, and the parties have now stipulated that the language contained in the DCSA Agreement entered into between Weir and DCSA was typical of that used in other DCSA marketing agreements. Therefore, prior to examining the particular document, on July 3, 1969 Lawson's responded to Weir's correspondence with the following letter:

Dear Mr. Weir:

This will acknowledge receipt of your letter of June 27, 1969, in which you advise us that you have entered into a marketing agreement with Dairymen's Cooperative Sales Association.

We assume that the contract that you have entered into is a typical cooperative contract which delegates to the cooperative the exclusive right to market your milk wherever the cooperative may desire, which may or may not be the Lawson Milk Company. If this assumption is true, we point out that this would violate paragraph fourth of your contract with the Lawson Milk Company, entered into on September 1, 1958, which is still in effect.

You indicated in your letter that it was your intention not to terminate your contract with us, but continue to sell and ship your milk to us. We respect your good intentions, but point out that your contract with the DCSA may not allow you to do this.

We do not quarrel with your joining DCSA, and this is a matter of your own business judgment. However, since we have no other producers who are members of the DCSA it would require us to establish a business relationship and deal with DCSA for the milk supply of only one producer. This would not be administratively feasible or desirable in our business judgment. We regret, therefore, that we will not receive your milk after August 1, 1969. Your hauler has been notified.

Very truly yours,

/s/ Morgan Pettit

Morgan Pettit

Manager, Milk Procurement

Weir did not reply to Lawson's letter.

Sometime after Lawson's had written to Weir, Lawson's received a letter from DCSA which was dated July 2, 1969 in which DCSA stated:

Dear Sir:

This is to advise you that milk producer John H. Weir, R. D. #1, Carrollton, Ohio, 44615, has signed a marketing agreement with the Dairymen's Co-operative Sales Association effective July 1, 1969. It is our desire that Mr. Weir's milk production continue to be sold to Lawson's. Hence, there should be no need for a hauling or any other change at this time.

However, will you please deduct 11½ cents per hundredweight from Mr. Weir's final settlement check each month and transmit this amount to this office, together with a record of the total pounds he shipped to you.

Dairymen's Co-operative Sales Association is an approved cooperative under the provisions of Federal Order #36.

Sincerely,

DAIRYMEN'S CO-OPERATIVE SALES ASSOCIATION

/s/ Homer H. Martz

Homer H. Martz,

Manager

Lawson's, however, deemed that its Marketing Agreement with Weir had been terminated by its letter of July 3, 1969 and did not respond to the DCSA letter.

On October 1, 1969, DCSA again wrote to Lawson's stating:

Procurement Manager
Lawson Milk Company
210 East Broad St.
Cuyahoga Falls, Ohio

Dear Sir:

Our records show the dues for our Member, John H. Weir, R.D. 1, Carrollton, Ohio 44615, to be open on our books for August 1969 milk. Please remit at your earliest convenience and oblige.

Yours very truly,

DAIRYMEN'S CO-OPERATIVE SALES ASSOCIATION
A. C. Kasper
Assistant Treasurer

And on October 3, 1969, Lawson's sent the following reply:

Mr. A. C. Kasper, Assistant Treasurer
Dairymen's Cooperative Sales Association

451 Century Building
Pittsburgh, Pennsylvania 15222

Dear Sir:

In reply to your letter of October 1, 1969 John H. Weir, R.R. #1, Carrollton, Ohio has not sold milk to The Lawson Milk Company since July 31, 1969.

Very truly yours,

Morgan W. Pettit
Procurement Manager

On June 2, 1970, Weir wrote to the Secretary of Agriculture requesting:

Dear Sir:

I am a farmer operating a 553 acre farm in Carroll County, Ohio. I have a dairy herd of approximately 56 cows and for ten years prior to August 1, 1969 my milk was sold to Lawson Milk Company, 210 Broadway East, Cuyahoga Falls, Ohio. On June 27, 1969 I joined Dairymen's Cooperative Sales Association, 451 Century Building, Pittsburgh, Pennsylvania, a farm-ers cooperative milk marketing association. It was my desire that the cooperative represent me in my dealings for my milk with the Lawson Milk Company.

On June 27, 1969 I notified the Lawson Milk Company by letter that I had joined DCSA (copy attached). As a result of my letter the Lawson Milk Company cut me off and refused to buy any more milk from me. (Copy of letter from Lawson Milk dated July 3, 1969 attached).

I am writing to request that you immediately initiate an action against Lawson Milk Company for violating the recently enacted federal law on Unfair Trade Practices Affecting Producers of Agricultural Products (7 USCA Sections 2301–2306), because Lawson has refused to deal with me because of my membership in DCSA.

Very truly yours,

John H. Weir

On July 29, 1971, the Secretary of Agriculture filed this action against Lawson's charging it with violations of the Agricultural Fair Practices Act.

## CONCLUSIONS

The issues before this Court are 1) whether Lawson's violated the Agricultural Fair Practices Act of 1967, in particular 7 U.S.C. § 2303, by terminating its Marketing Agreement with Weir upon receipt of notice from Weir that he had entered into a marketing contract with DCSA and 2) whether the fourth paragraph of Lawson's Marketing Agreement, which provides that Lawson's shall be permitted to terminate its agreement with a producer should he enter into an agreement with any association for the sale of his milk, is a *per se* violation of § 2303.

Although the issues in this case appear to be narrowly drawn, as the proceedings herein have evolved, it has become increasingly apparent that the Agricultural Fair Practices Act of 1967, 7 U.S.C. §§ 2301–2306, in its final form is a creature of conflicting intent and is, as a result,

fraught with seemingly inconsistent and paradoxical provisions. In order for this Court, therefore, to determine whether Lawson's has engaged in unfair trade practices under § 2303, a thorough analysis of the legislative history surrounding the enactment of the Act and a determination of the meaning of and the legal significance to be ascribed to other provisions of the Act, particularly § 2304, and certain federal regulations promulgated thereunder is necessary.

### Legislative History

■ As demonstrated by the Congressional findings and declaration of policy, 7 U.S.C. § 2301, the overriding purpose of Congress in enacting the Agricultural Fair Practices Act of 1967 was to protect the individual producer of milk in his right to band together with other producers or, in effect, to unionize:

> . . . The efficient production and marketing of agricultural products by farmers and ranchers is of vital concern to their welfare and to the general economy of the Nation. Because agricultural products are produced by numerous individual farmers, the marketing and bargaining position of individual farmers will be adversely affected unless they are free to join together voluntarily in cooperative organizations as authorized by law. Interference with this right is contrary to the public interest and adversely affects the free and orderly flow of goods in interstate and foreign commerce.
>
> It is, therefore, declared to be the policy of Congress and the purpose of this chapter to establish standards of fair practices required of handlers in their dealings in agricultural products.

In order to effectuate its purpose, Congress enacted § 2303, the Prohibited Practices section, which the Senate Committee on Agriculture and Forestry referred to as the "heart of the bill." [2]

The section establishes rigid standards of fair play which are required of handlers such as Lawson's in their dealings with producers. As the Committee stated, the section was designed to prohibit a handler from interfering with a producer's free choice to belong to a cooperative association.

■ It should be noted at this point that an association of producers may also fall within the definition of a "handler," as defined in 7 U.S.C. § 2302(a),[3] and the parties herein have stipulated that DCSA is a handler within the meaning of that provision. In light of this fact, Lawson's has argued by way of defense in this action that DCSA has been guilty of violations of § 2303 in its dealings with Weir. In particular, Lawson's argues that the contract which Weir signed with DCSA, a handler, was violative of § 2303(c) in that the DCSA Marketing Agreement coerced Weir to terminate his Marketing Agreement with Lawson's. The Court has expressed its agreement with the Government's position that the legality of DCSA's practices is not at issue in this lawsuit. However, Lawson's contends that the legislative history surrounding the enactment of § 2303 demonstrates that Lawson's is not liable under that section for terminating its Marketing Agreement with Weir because of his entering into a marketing agreement with DCSA, in that such termination was not a refusal to deal with Weir because he joined DCSA. Lawson's argues that its conduct in so terminating Weir is, in fact, expressly sanctioned under § 2304.

As this Court noted previously, the Agricultural Fair Practices Act of 1967, 7 U.S.C. §§ 2301–2306, seems to be the product of conflicting intents. Clearly the Prohibited Practices section, § 2303, was designed to effect the declared purpose of Congress in enacting the Act. And, one of the most effective ways of preventing a handler from interfering

---

2. Pub.L. 90–288, 1968 U.S.Code Cong. and Admin.News, p. 1870.

3. Marketing Assistance Plan, Inc. v. Associated Milk Producers, Inc., 338 F.Supp. 1019 (D.C.Tex.1972).

with a producer's freedom to join a cooperative association was to provide that it would be unlawful for a handler to refuse to deal with a producer because of the exercise of his right to join and belong to such an association, 7 U.S.C. § 2303(a). It would appear, therefore, as the Government has argued, that by terminating its Marketing Agreement with Weir upon receipt of notice from Weir that he had entered into a Marketing Agreement with DCSA, a cooperative association, Lawson's was in violation of § 2303(a).

However, although the termination of producer's marketing agreement could reasonably be interpreted as a refusal "to deal with any producer because of the exercise of his right to join and belong to an association," in violation of § 2303(a), Lawson's contention that a handler may lawfully terminate its marketing agreement with a producer who enters into an exclusive agency agreement with an association finds support in the legislative history of the Act. The Senate Committee stated:

> As introduced, the bill prohibited discriminating against a producer because of his "contract with" an association. Some witnesses were fearful that the contract might be an exclusive agency contract, which would prohibit direct dealings by the producer with the handler. Then, if the handler tried to deal with the producer, he would be guilty of attempting to induce the producer to breach the contract; and if he refused to deal with the producer for that reason, he might be guilty of discriminating against the producer because of the contract. In other words the handler would be guilty under section 4(a) [§ 2303(a)] if he did, and guilty under section 4(b) [§ 2303(b)] if he did not. This would be manifestly unjust and unreasonable, and the committee has recommended omitting the words "or contract with" from section 4(b).[4]

Lawson's has argued that this suit involves the precise situation which Congress sought to avoid by omitting the words "contract with" from the Prohibited Practices section. At the final hearing in this action Lawson's presented expert testimony regarding the nature and effect of the DCSA Marketing Agreement signed by Weir, in an effort to establish its defense that the termination of Weir's contract had nothing to do with the fact that Weir had joined DCSA, but was, rather, based upon the Lawson's compelling business need to have control over an individual producer's milk production and the subsequent sale of that milk.

Beyond this, Lawson's argued that although the bill as first introduced was supposed to be analogous to the National Labor Relations Act of 1947, 29 U.S.C. § 151 et seq., in providing almost absolute protection by law of the right of employees to organize and to bargain collectively, Congress by adding Section 5 to the Agricultural Fair Practices Act, 7 U.S.C. § 2304 diluted the impact of the Act and substantially altered the Act's intended similarity to the National Labor Relations Act. Lawson's contends that Congress incorporated Section 5, the Disclaimer section, in an effort to protect handlers like Lawson's from the potentially "manifestly unjust and unreasonable" situation which Congress had foreseen might result should a handler be required by law to maintain a prior marketing agreement with a producer after that producer signed a conflicting exclusive agency marketing agreement with an association of producers. As set forth above, § 2304 provides that:

> *Nothing in this chapter shall* prevent handlers and producers from selecting their customers and suppliers for any reason other than a producer's membership in or contract with an association of producers, *nor require a handler to deal with an association of producers.* (Emphasis added.)

4. Pub.L. 90–288, 1968 U.S.Code Cong. and Admin.News, pp. 1872–1873.

■■ The language of § 2304 and the Committee remarks pertaining to the section make it quite clear that Congress in enacting this Agricultural Fair Practices Act was concerned with providing some protection to the handlers of agricultural products as well as with providing protection to the producer. The Committee stated:

Section 5 disclaims any intent to prevent handlers and producers from selecting their customers and suppliers for any reason other than a producer's membership in an association of producers, or *to prevent handlers and producers from dealing with one another individually on a direct basis, or to require a handler to deal with an association of producers*. The bill does not prevent or require these actions and is not intended to do so. While the proponents of the bill stated in their testimony that this was not the purpose, there was some concern, especially on the part of processors and other purchasers of agricultural products, that the bill in fact went further than intended. The committee felt that a clear statement in the bill itself would be helpful to courts, handlers, associations, producers, and others in their construction of this legislation; and has recommended inclusion of this section in the bill.

There are many good, sound economic reasons for handlers and producers to select customers and suppliers. *The bill does not attempt to prevent these sound reasons from operating.*

*While the bill does not prevent handlers and producers from dealing with one another individually on a direct basis,* it does prevent handlers from exerting any improper pressure in an effort to weaken associations or discourage membership. *While the bill does not require a handler to deal with an association of producers, it certainly makes clear that farmers have a right to form such associations and*

*should be protected in the exercise of this right.* The fact is clear that an association of producers which has obtained the voluntary membership of a large number of farmers deserves respect and recognition by the handler of agricultural products. (Emphasis added.)[5]

The Court finds that the thrust of this section is to protect the right of a handler, in the exercise of its sound business judgment, to continue to deal with one of its producers directly even though he may become a member of an association. And, it would appear that § 2304 should be interpreted to protect the handler's right to deal directly with the producer even though the producer in joining the cooperative may have assigned exclusive agency rights to the association for the sale of its milk.

In this regard, Lawson's presented testimony at the hearing to show that if it had not terminated its agreement with Weir upon receipt of notice from Weir that he had entered into a marketing agreement with DCSA, that Lawson's would have been forced to deal with DCSA, not only because of the marketing agreement which Weir signed with DCSA, but, moreover, that it would have been required to "deal" with DCSA by law. Lawson's contention in this regard raises another seeming paradox within the Agricultural Fair Practices Act framework. Lawson's had cited to 7 CFR § 1036.1, et seq., which contains regulations governing the sale of milk in the Eastern Ohio-Western Pennsylvania Marketing Area. Lawson's contends that in addition to the practical effect of the DCSA Marketing Agreement which Weir entered into, assigning to DCSA exclusive control over his milk, that a cooperative association in the relevant marketing area is by definition a producer's exclusive agent. Thus, in 7 CFR § 1036.-18, a cooperative association is deemed:

(b) To have full authority in the sale of milk of its members and to be en-

5. Pub.L. 90–288, 1968 U.S.Code Cong. and Admin.News, p. 1873.

gaged in making collective sales or marketing milk for its members; and;

(c) To have all of its activities under the control of its members.

Moreover, Lawson's contends that at the time Weir entered into the DCSA Marketing Agreement, Lawson's would have been required under 7 CFR § 1036.70, to forward a part of the proceeds for Weir's milk to DCSA and to forward the remainder to Weir himself. The requirements set forth in that section are currently contained in 7 CFR § 1036.73, part (b) of which would have required that Lawson's pay all of the proceeds due from the receipt of Weir's milk directly to DCSA, if DCSA so requested in writing. Lawson's argues that making such payments would constitute "dealing" with DCSA, and that Lawson's is expressly authorized to refuse to so deal under § 2304.

■ The seeming inconsistency of the provisions of the Act and the federal regulations enacted pursuant thereto have made a determination in this case very difficult. However, the Court concludes that although the original purpose of Congress in enacting the Act may have been considerably weakened by the inclusion of the Disclaimer section, § 2304, the Act is not so vague and ambiguous, nor is it so impossible to interpret nor discriminatory with respect to handlers as to constitute a denial of due process and equal protection of the laws of the United States to handlers. In addition, although this Court is inclined to believe that a handler would be legally justified in refusing to deal directly with an association of producers despite the regulation which would purport to require a handler to remit certain payments to an association of producers upon written request, this issue need not be reached by this Court under the particular facts involved in this lawsuit.

■ The Act does provide protection for handlers such as Lawson's, and in light of § 2304, the Court concludes that Lawson's could have lawfully refused to deal with DCSA when it received notice

from Weir that he had entered into a Marketing Agreement with DCSA. If the particular DCSA Marketing Agreement signed by Weir prohibited Weir's continued direct dealing with Lawson's, Lawson's could probably have legally terminated its Marketing Agreement with Weir. However, these are not the facts before the Court.

■ In his letter of June 27, 1969, Weir informed Lawson's that he had entered into a marketing contract with DCSA, and that DCSA would represent him in all matters pertaining to the sale of his milk to Lawson's. In addition, Weir stated that he had authorized a deduction from the proceeds of his milk sold to Lawson's to be paid over to the cooperative. However, in his letter Weir stated "*I trust* that you will cooperate and make the deduction and pay it over *as I have requested,*" and he did express his intention to continue to sell and ship his milk to Lawson's. Based upon this letter and Lawson's familiarity with the language of the typical form DCSA Marketing Agreement, Lawson's allegedly terminated Weir's contract on the ground that it would henceforth be required to deal with DCSA. The Court finds that Lawson's actions were premature in this regard. Lawson's could have informed Weir at that time that it would not deal with DCSA, and that should Weir's contract with DCSA require that Lawson's do so that it would terminate its Marketing Agreement with Weir. In fact, in its letter to Weir dated June 27, 1969, Lawson's indicated that despite Weir's stated intention not to terminate his contract with Lawson's, his contract with DCSA *might* not allow him to do this. However, without affording Weir an opportunity to rebut Lawson's presumptions, or the opportunity to exercise his protected right to choose to deal directly with Lawson's, Lawson's terminated the Marketing Agreement and *refused to deal with Weir thereafter.*

■ Although Congress did intend to protect the handler from being placed in a position where he would be forced

to deal with an association of producers against its better business judgment, the Prohibited Practices section makes it clear that a handler cannot refuse to deal with an individual producer because of his membership therein. Therefore, it was incumbent upon Lawson's to allow Weir the opportunity to continue to deal directly with Lawson's regardless of his membership in DCSA. In terminating Weir on the basis of his letter and Lawson's presumptions regarding the DCSA Marketing Agreement, Lawson's was in effect, refusing to deal with Weir because of his membership in DCSA, in violation of § 2303(a). In fact, had Lawson's seen the Marketing Agreement which Weir did sign with DCSA, it would have been apparent that Weir had an opportunity to continue to deal with Lawson's as he had in the past. The relevant portions of that agreement provided:

FIRST: That the Producer appoints the Association his sole and exclusive agent to sell all milk and cream produced on any farm in the control of or operated by said Producer · except such milk and cream as said Producer may retain for home consumption (*unless the Producer secures the written consent of the Association to dispose of said milk and cream in another manner*) . . .

SIXTH: This agreement shall supercede and terminate all other contracts agreements, or arrangements heretofore made by a Producer with respect to the sale of his milk or cream *so long as no conflict occurs with existing contracts with other parties* and the Producer hereby agrees not to renew and agrees to terminate at the earliest possible date any other existing contracts which would conflict with the Associations authority as the sole and exclusive agent for the undersigned Producer in the sale or handling of such milk or cream. . · · (Emphasis added.)

As the italicized portions of the DCSA contract indicate, Weir might have been permitted to deal directly with Lawson's despite the DCSA contract, and Lawson's Marketing Agreement would not necessarily have been superceded by the DCSA agreement. Lawson's could have remained the sole and exclusive buyer from Weir until Weir terminated the Lawson's agreement, which termination was, of course, to be at "the earliest possible date." Nevertheless, and without regard to the lawfulness of the DCSA contract, which issue is not before the Court, assuming that the earliest possible date on which Weir could legally terminate his contract with Lawson's was after thirty days notice, pursuant to paragraph "SIXTH" of their Agreement, during that thirty day period, Lawson's Marketing Agreement with Weir would not necessarily have been crippled by the fact of Weir's signing with DCSA. In fact, Lawson's was also in the position to give notice to Weir, upon receipt of his letter informing Lawson's that he had entered into an agreement with DCSA, that it intended to terminate its contract with Weir in thirty days and that for that thirty day period it would continue to deal .directly with Weir and would not in any event deal with DCSA. Had Lawson's taken this action, and had Weir then stated to Lawson's that he refused to deal directly with Lawson's, this Court would be confronted with an entirely different situation. However, under the facts of this case, Lawson's termination of its Marketing Agreement with Weir must be viewed as a refusal to deal with him because of his membership in DCSA. Although Lawson's might later have been placed in a situation in which DCSA might have attempted to require Lawson's to deal directly with it, and Lawson's could then have lawfully refused to deal with DCSA and Weir, the termination of Weir in this instance was too premature for this Court to find that Lawson's conduct was lawfully based upon the provisions of § 2304.

Similarly, the FOURTH paragraph of Lawson's contract must be

found to be unlawful and in violation of § 2303. The objectionable portion of that paragraph reads:

> FOURTH: *Should the Producer,* during the period covered by this agreement, *enter into an agreement with any* person, group, firm, *association,* or corporation for the sale of his milk, effective during the period covered by this contract, . . . *the Company shall be relieved thereafter from all further obligations to purchase the Producer's milk* and the Company may, if it desires, give notice to the Producer that it desires forthwith to cancel this agreement, . . (Emphasis added.)

The Court finds that such language is too broad to be interpreted as a lawful application of the Disclaimer section of the Act. Again, Lawson's has presented argument and sought to introduce evidence with regard to the economic necessity for such a provision in its marketing agreements. Although in reviewing the DCSA Marketing Agreement, the Court has gained some insight into the problem with which Lawson's and other handlers may be confronted, the intent of Congress to protect the right of the individual producer to join an association of producers is clear. And, a provision in a contract which would afford a handler the right to cancel its contract with a producer simply because the producer *has entered into an agreement* with a cooperative, regardless of the nature of that agreement, can only be interpreted as coercive against a producer's right to join and belong to an association. Of course, a handler could lawfully state in its marketing agreement that should the producer exercise his right to join a co-

operative, the handler will exercise its right not to deal with that association. But the mere fact that a producer has entered into an agreement with a cooperative association cannot, under the provisions of the Agricultural Fair Practices Act, serve as a legal justification for refusing to continue *to deal with that producer.*

The Court, therefore, concludes that Lawson's termination of its Marketing Agreement with Weir by letter of July 3, 1969, was in violation of 7 U.S.C. § 2303(a) and that the FOURTH paragraph of Lawson's Marketing Agreement is unlawful and in violation of 7 U.S.C. § 2303(a). Accordingly, Lawson's is hereby permanently enjoined from refusing to deal with John Weir because of his membership in DCSA. In addition, Lawson's is permanently enjoined from including the FOURTH paragraph contained in its Marketing Agreement with Weir in any of its marketing agreements. This opinion shall not be interpreted, however, in any way to require that Lawson's "deal" with DCSA. Unless Congress shall indicate to the contrary, it is this Court's position that as long as a handler such as Lawson's has a valid and subsisting exclusive agency marketing agreement with a producer of milk, should that producer enter into a marketing agreement with a cooperative association, no provisions of the Act nor any federal regulations enacted pursuant thereto will require that Lawson's deal with that association of producers, and a handler may, in its sound business judgment, require the producer to deal directly with it pursuant to terms and conditions which may be set forth in its marketing agreement.

It is so ordered.